# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

BRENDA BELLAY,

     Plaintiff,

v.                                  No: 8:19-cv-206-T-02-JSS

OFFICER TYLER SHUE, individually,
and CITY OF TAMPA,

     Defendants.
_____/

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

     This is a false arrest and excessive force case.  The matter came before the Court for a hearing on Officer Tyler Shue's motion for summary judgment, Docs. 28, 32, and Plaintiff's response, Docs. 39, 40.  The Court heard argument from counsel.  Because the facts are entirely in contest, the Court denies the motion.

     This matter arises out of a late-night arrest of Plaintiff in September 2015 by Defendant Shue, a Tampa police officer.  Shue arrested Plaintiff at the Tampa bar MacDinton's for resisting arrest and trespass with warning.  Docs. 28-1; 28-2 at 15.  The state attorney later dismissed the charges.

     Plaintiff asserts seven counts in her complaint.  Against Officer Shue, Plaintiff asserts Count I, a claim for false arrest under 42 U.S.C. § 1983; Count II, a common law false arrest claim; Count IV, a claim for excessive force under 42

U.S.C. § 1983; Count V, a common law battery claim; and Count VII, a 42 U.S.C. § 1983 freedom of speech claim.  The two counts against the City of Tampa, for common law false arrest and common law battery, are not the subject of the motion for summary judgment.

**The Summary Judgment Standard:**  The summary judgment standard is well-cited, and the Court need not set forth quotations from the hornbook law here. Suffice it to say, under Federal Rule of Civil Procedure 56(a) judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Court examines "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" to determine if there is any issue as to material fact. *Jones v. City of Columbus, Ga.*, 120 F.3d 248, 251 (11th Cir. 1997).  The movant carries this burden.  *Celotex Corp. Catrett*, 477 U.S. 317, 323 (1986).

The Court must weigh the evidence in a light most favorable to the non-movant.  *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).  The issue is whether the evidence is so one-sided that a reasonable jury could only arrive at a verdict in the movant's favor.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  Making credibility determinations and weighing conflicting evidence are not appropriate at this stage.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

After assessing the evidence in a manner described above, in police encounter cases the Court often must address the issue of qualified immunity. Qualified immunity is a doctrine that shields "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Carruth v. Bentley*, 942 F.3d 1047, 1053 (11th Cir. 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Law enforcement officers acting within their discretionary authority "are entitled to qualified immunity from suit unless a plaintiff can establish that (1) the officer violated a constitutional right, and (2) the right violated was clearly established." *Alston v. Swarbrick*, 954 F.3d 1312, 1318 (11th Cir. 2020).  If "the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial." *Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002).

Here, Officer Shue was at all times acting within his discretionary authority as a police officer.  Therefore, the question for the Court is whether Shue violated Plaintiff's clearly established constitutional rights.

**The Factual Basis:**  Many of the facts in this case are disputed and somewhat murky given the passage of time between the incident and the witness

depositions.  The uncontested facts are fairly few.  Exactly what happened is "choppy" on this record, as regrettably is the summary here.  It appears that Plaintiff and a female friend were out for the evening, eating dinner and then visiting several bars in the Howard Avenue area of Tampa.  It was the friend's fiftieth birthday.  Doc. 28-6 at 7.  The pair had several drinks.  Plaintiff states that she only had two drinks the entire night.  Doc. 28-5 at 66.  That might be true, but the MacDinton's arrest incident happened after 1:00 a.m. Sunday morning, after the pair had visited about five different bar/restaurants.  *Id.* at 66, 68.

   *1. Cellphone video of the incident*

   Plaintiff sought to record the incident with her phone but was unsuccessful in completing a full recording; we have only a few fairly incomprehensible snippets.  Doc. 34.[1]  Plaintiff's video (taken before her arrest) shows that she and the friend were in MacDinton's parking lot, and there was a lot of loud music.  *Id.* Plaintiff's apparently-drunk friend can be seen wearing a bar-admit-type plastic wristband that did not come from MacDinton's.  *Id.*; Doc. 28-4 at 36–38.  In one video snippet, Plaintiff's friend strikes Shue's fellow officer on the chest with her open hand while loudly cursing.  Doc. 28-5 at 61; Doc. 34.  The blow Plaintiff's friend made to the officer was not a hard strike, but the video shows it was plainly what one would call a battery.  *See* Doc. 28-3 at 10; Doc. 34.   In another snippet

---

[1] The snippets are on a CD, which is kept as a physical record by the Clerk at Doc. 34.

the friend is seen on her knees in the parking lot with the fellow officer standing

nearby.  Doc. 34.  Another snippet depicts the arrest of the friend, during which

Officer Shue appears to tell Plaintiff to "Back up.  Back up."  *Id.*; Doc. 28-2 at 52;

Doc. 28-5 at 61, 129.

A recorded snippet with unclear video also depicts Officer Shue telling

Plaintiff sternly, "Drop the phone or I'm going to break it."  Doc. 28-2 at 51.

Plaintiff then says, "No, I'm not going to," whereupon there is an immediate

scuffle, the phone is upset, and Shue physically arrests or takes down Plaintiff,

which cannot be seen clearly on video.  Doc. 28-5 at 62.  At one point in this

snippet, Plaintiff states in exclamation, "You must not know."  Doc. 34; Doc. 28-2

at 51; Doc. 28-5 at 86.  This is consistent with Plaintiff's statement that she told the

officers it was legal to video record police.  Doc. 28-5 at 61, 83, 116, 129, 153.

*2. Testimony regarding Plaintiff's arrest*

With an incomplete recording of the incident, deposition testimony must be

relied on to fill in the gaps.  We can begin with the few points on which there is

agreement in the record.  The consensus is that the events at the heart of this

lawsuit were set in motion when Plaintiff's friend and MacDinton's security agents

became engaged in a heated confrontation.  *Id.* at 74.  Responding to the

commotion, Officer Shue and a fellow officer arrived at the scene and asked the

friend for her identification.  The friend refused the officers' request for

identification "numerous times." *Id*. at 75.  Shue's fellow officer testified he needed the identification to do a trespass warning.  Doc. 28-3 at 9–10.  But the friend refused to produce it and was yelling.  *Id*.; Doc. 28-5 at 60–61, 75.  Plaintiff also testified that the other officer asked Plaintiff for her identification.  Doc. 28-5 at 61, 78–79.

Most of the remaining facts are in dispute, which requires the Court to credit Plaintiff's version of events.  As the officers handcuffed the friend, they told Plaintiff twice to back away from them.  *Id.* at 81.  Plaintiff testified that she took a step backward as ordered and announced she was videotaping and that it was not illegal.  *Id.* at 83.  Then, according to Plaintiff, Shue slammed her into a car and said, "relax," and then he said, "Drop your phone or I'm going to break it."  *Id.* at 84.

Plaintiff testified Officer Shue accosted her angrily and without warning, apparently incensed that she refused to stop filming.  She states that after a forceful takedown, Shue kicked her in the back of the head while she was prone, handcuffed, and compliant, and then yanked her up by the arms, which injured her further.  Doc. 28-5 at 152–155.  Officer Shue denies all of this.  *See* Doc. 28-2.

6

No other competent evidence exists regarding Plaintiff's physical arrest beyond the parties' opposing narratives.[2]  But the available video snippets do contradict Plaintiff's story as to the timing of when Shue ordered her to drop the phone.  The video shows Officer Shue directed Plaintiff to drop her phone right before the takedown—not after.  Doc. 34.

The testimony of Plaintiff's friend generally aligns with the video in terms of timing.  The friend recalled that things escalated after she "flat hand pushed" the police officer.  Doc. 28-6 at 13–14, 17.  She testified that at some point Shue's fellow officer started to "drag" her and "question" her.  *Id.* at 38.  As this was happening, Plaintiff asked the officer, "What's going on?" and was within arm's reach when she did so.  *Id.* at 38.  Plaintiff's friend testified the officer asked Plaintiff to stop recording, and when she did not, the officer knocked the phone out of Plaintiff's hand.  *Id.* at 16.  The friend denied being drunk but testified about having four drinks.  *Id.* at 35, 38.

### 3. Conflicting testimony on the events post-arrest

---

[2] The MacDinton's security guard testified with a hazy recollection due to the four years since the incident and it being a commonplace, routine event to call police for patron trouble at this popular party bar.  He first testified that he did not recognize Plaintiff and had no recollection of the incident at all, but then noted it was "kind of coming back" to him but, as he put it, he was going "on an hour of sleep . . . and this was four years ago."  Doc. 28-4 at 5–6, 9, 12.  He kept no notes or report.  His testimony is too vague and indefinite to have any bearing at this stage, on a cold written record.  His hazy recollection might be presented to the jury for whatever it is worth.  He favors Defendant's version of events.

An equally contested set of facts involves the incidents post-arrest.  Officer
Shue testified that he offered Plaintiff a notice to appear so that she could be
released and appear on charges later, at her own recognizance.  Doc. 28-2 at 55.
This is what happened to the apparently-drunk friend who struck the other officer.
Doc. 28-6 at 21–22.  Shue says Plaintiff refused to sign the notice to appear.  Doc.
28-2 at 55.  Plaintiff says Shue thrust some item or clipboard at her, did not explain
was it was, and told her to sign something that she believed to be inculpatory—so
she did not.  Doc. 28-5 at 162–63.

Also in contest are facts concerning medical treatment at the scene.  Shue
testified that Plaintiff had some sort of seizure while waiting to be transported, and
the officers had to call an ambulance so she could be medically assessed.  Doc. 28-
2 at 54.  Officer Shue also testified that Plaintiff began slamming her head against
the seat partition, and had to be put into a posey vest-type physical restraint.  Doc.
28-2 at 55–56.  Shue's fellow officer also testified he had to put Plaintiff into this
restraint garment.  Doc. 28-3 at 15.  This fellow officer said emergency medical
service ("EMS") had to be called when Plaintiff evinced some sort of injury.  Doc.
28-3 at 13, 24.  Plaintiff denies any recollection of this happening at all.  Doc. 28-5
at 153–154.

There is an EMS run report showing this ambulance appearance on the
scene, with Plaintiff listed as the patient being assessed, and noting that Plaintiff

had been reported as passed out and unable to be aroused, or "unconscious fainting." Doc. 49-1 at 1–13; Doc. 49-2 at 10.  The report noted Plaintiff was "awake and yelling," *id.* at 11, with no pain complaints or handcuff pain or injury. *Id.* at 27–30.  In this report the primary impression was psychiatric disorder, with the condition code listed as "alcohol intoxication or drug overdose."  *Id.* at 16–17. The EMS officers testified but had no recollection of the incident independent of the report.  Doc. 49-1 at 7; Doc. 49-2 at 28.  Plaintiff says she recalls no encounter with an ambulance or EMS paramedics that evening.  Doc 28-5 at 153.  Her lawyers suggested at the hearing this may have been a mistake in identity and it might have been the drunk friend who was attended to by EMS.  Shue's counsel suggest Plaintiff may have been too drunk or upset to remember.  Shue's testimony and the run report show she was the drunk, yelling patient as listed by EMS.  Doc. 28-2 at 54–55.  This is a jury question as to what happened.

The disputed history is further highlighted by the fact that Plaintiff's injuries are consistent with both versions of the case.  Plaintiff was bonded out of jail on Sunday, the day of her arrest.  She went to see a lawyer on Monday and did not seek medical attention until Tuesday.  The clinic on Tuesday offered pain medication, which she declined.  Doc 28-5 at 97.  Her mild-to-moderate bruising on the legs and wrists, and palpable bump on the head, *see id.* at 180–186, are

9

consistent both with her story that she was attacked, and with that of Officer Shue

that she resisted and engaged in a manic fury while restrained.

**The False Arrest Counts:**  Counts I and II allege false arrest under 42

U.S.C. § 1983 and Florida common law, respectively.  Plaintiff was arrested for

trespass with warning, Fla. Stat. § 810.09(2)(a) (2015), and resisting an officer

without violence, Fla. Stat. § 843.02 (2015).

An arrest without a warrant and lacking probable cause violates the

Constitution and can be an underpinning for a false arrest claim.  *Brown v. City of

Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010).  But the existence of

"probable cause constitutes an absolute bar to both state and § 1983 claims alleging

false arrest." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998); *Fernander v.

Bonis*, 947 So. 2d 584, 589 (Fla. 4th DCA 2007) (same).  In the qualified immunity

context, an officer must establish only "arguable probable cause" to defeat a false

arrest claim.  *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001).  Here,

arguable probable cause existed if a reasonable officer placed "'in the same

circumstances and possessing the same knowledge as [Officer Shue] could have

believed that probable cause existed to arrest' the [P]laintiff[]."  *Id.* (quoting *Redd

v. City of Enterprise*, 140 F.3d 1378, 1384 (11th Cir. 1998)).  The existence of

arguable probable cause is judged under an "objective" standard and "does not

include an inquiry into the officer's subjective intent or beliefs." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1257 (11th Cir. 2010).

The analysis begins with the trespass without warning charge. This was the alleged offense that triggered the interaction between Officer Shue and Plaintiff that ended in her arrest.  The offense of misdemeanor trespass consists of four elements: "(1) the [individual] willfully entered or remained on property; (2) other than a structure or conveyance; (3) without being authorized, licensed, or invited; (4) when notice against entering or remaining had been given to the [individual]." *Seago v. State*, 768 So. 2d 498, 500 (Fla. 2d DCA 2000); Fla. Standard Jury Instr. 13.4 (Crim.).  For the fourth element actual notice is required.  "When an invitation has been extended to enter an open business, actual communication is necessary to put a person on notice that he is no longer welcome on the property and may be arrested for trespass."  *K.M.B. v. State*, 69 So. 3d 311, 314 (Fla. 4th DCA 2011) (citing *Smith v. State*, 778 So. 2d 329, 331 (Fla. 2d DCA 2000)).

The element of notice is entirely in dispute here.  Plaintiff and Officer Shue are the only two persons who have provided any substantive, factual testimony in this record about the precise details of their interaction leading up to Plaintiff's arrest.[3]  And their stories are in direct conflict.

---

[3] Officer Shue's fellow officer at the scene did not recall any significant details of Shue's interaction with Plaintiff. During that time, the fellow officer was occupied with Plaintiff's misbehaving friend, and did not offer any testimony about the relevant interactions between

Officer Shue testified that when he arrived at MacDinton's he was told by the fellow officer that the two ladies had been asked to leave and were refusing to do so.  Doc. 28-2 at 8.  He testified that he asked Plaintiff to leave, notifying her that she was requested to depart.  *Id.* at 10–11.  Plaintiff's friend was on the ground when he arrived.  *Id.* at 10.  The officers helped the friend get up, and she then struck the fellow officer, and Plaintiff still refused to leave.  *Id.* at 13.  Office Shue testified Plaintiff kept crowding him, which is a safety issue.  He claims he had to push her back several times, and she interfered with his investigation.  *Id* at 15, 22.  In one of the tape snippets, it appears Officer Shue is telling Plaintiff to "back up."  *Id.* at 52.

Officer Shue further testified that when he was arresting Plaintiff, she kept saying something like, "Do you know who I am?" repeatedly.  Doc. 28-2 at 17. Concerning this, Plaintiff testified: "I said [to Shue] my name is Brenda Bellay, please check the Tampa Police record of false arresting me [a prior false arrest I was exonerated on] and he yelled 'I don't care who you are.'" Doc. 28-5 at 86.

Plaintiff's version of the facts differs entirely from Officer Shue's. According to her, she was calmly attempting to film the incident with her phone, and backed up when instructed.  She states that Officer Shue accosted her in an

---

Plaintiff and Defendant, nor is any such detail in his written report.  Doc. 28-3 at 12–13, 14, 16–19.

enraged fashion, apparently incensed by her videotaping.  Doc. 28-5 at 61, 83–88, 117.  She also flatly denies that she was ever trespass noticed, or instructed by anyone to leave the premises.  She says she was not.  Doc. 28-5 at 75, 79, 116, 169.  Shue says she was.  Doc. 28-2 at 10–11.  Nobody else says anything.[4]

Given these diametrically opposed accounts, this is not a case where there is "arguable notice" or "arguable probable cause."  Either there was an express trespass notice/warning, or there was not—there are no shades of gray here.  Plaintiff squarely states no notice or trespass warning was given to her—ever.  Doc. 28-5 at 169.  Defendant claims the flat, absolute opposite.  Doc. 28-2 at 10–11.  The Court must construe these facts in Plaintiff's favor at this stage.  This material fact is in dispute and requires denial of the summary judgment motion on the false arrest counts.

The other crime charged, resisting without violence, is derivative of the trespass charge.  If there was no probable cause to arrest for trespass (as the evidence viewed in Plaintiff's favor establishes) then there could be no lawful charge of resisting (false) arrest without violence.  *Jackson v. State*, 192 So. 3d

---

[4] Officer Shue testified Plaintiff refused his instruction to depart.  Doc. 28-2 at 10–11.  Shue also testified that the fellow officer told Shue that the fellow officer had instructed both women to depart.  *Id.* at 57–58.  Plaintiff denies this, and the fellow officer only recalled instructing Plaintiff's misbehaving friend.

541, 543 (Fla. 4th DCA 2016) ("If an arrest is unlawful, a defendant cannot be guilty of resisting it without violence." (internal quotation marks omitted)).

As to the claim under Florida law for false arrest (Count II), Officer Shue argues that he is immune from suit under sections 768.28(9) and 776.05 of the Florida Statutes.  Section 768.28(9)(a) provides immunity as a matter of law for a state agent, acting within the scope of his employment, unless the agent "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  Again, accepting all of the facts asserted by Plaintiff, Officer Shue attacked her and kicked her gratuitously after arresting her without probable cause—thus acting in bad faith and with willful disregard of safety.  This Florida statutory defense will remain for trial on the many contested facts.

Likewise, section 776.05, entitled "Law enforcement officers; use of force in making an arrest," states in part that an officer need not retreat or desist in making a lawful arrest due to resistance of the arrestee, and the officer may use force that he reasonably believes is necessary to defend himself or herself or another from bodily harm in making the arrest.  § 766.05(1).  This statute appears only slightly on point, and does not affect the analysis at this stage.

14

**The Excessive Force Counts:**  Office Shue also moves for summary judgment on Counts IV and V, which allege 42 U.S.C. § 1983 excessive force arrest and common law battery, respectively.

When evaluating the constitutionality of an arresting officer's use of force, we must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the government's interest in safely apprehending the suspect.  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citations omitted).  This is necessarily a fact-intensive inquiry that requires a court to consider (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [s]he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  Assessment of an arrestee's excessive force claim is governed by a standard of "objective reasonableness." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–397 (2015).  If the Court credits Plaintiff's statement that she was compliant, lying on the ground, and Defendant Shue gratuitously kicked her in the head, this is clearly an objectively unreasonable use of force.  The qualified immunity standard is plainly not met for a gratuitous blow struck upon a complying, handcuffed arrestee.

The first *Graham* factor involves assessing the severity of the crime at issue. *Graham*, 490 U.S. at 396.  The underlying crime—a misdemeanor trespass— cannot fairly be described as "severe."  *Vinyard v. Wilson*, 311 F.3d 1340, 1347

15

(11th Cir. 2002); *see also Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (noting that "[d]isorderly conduct is not a serious offense" and "resisting arrest without force does not connote a level of dangerousness that would justify a greater use of force").

The second and third *Graham* factors—which ask whether the suspect poses a threat to officers or is attempting to evade arrest—also favor Plaintiff when accepting her version of events. The "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008). And there was no doubt at the time of this incident that, in the Eleventh Circuit, striking a compliant and nonthreatening suspect—particularly one in handcuffs—constitutes excessive force. *Id.*; *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000); *see also Smith v. Mattox*, 127 F.3d 1416, 1419–20 (11th Cir. 1997) (finding use of force following suspect's surrender that resulted in a broken arm was excessive even though suspect had previously been violent towards officers).

Officer Shue denies this "unprovoked kick to head" story factually. But he also suggests that it fails legally, because it runs afoul of the "sham affidavit" doctrine. He notes that a description of the excessive force can be found in the complaint and in Plaintiff's original interrogatory answers, and Plaintiff fails entirely to describe a kick to her head while she was handcuffed and prone. Only

in her deposition does this tale appear, notes Officer Shue.  Doc. 28-5 at 112.

Plaintiff testified about the kick to her head in her deposition when Officer Shue's

counsel asked whether she was kicked or kneed once she was handcuffed.  *Id.*

And then a month later Plaintiff amended her interrogatory answers to describe the

kick to the back of her head by Officer Shue.  Doc. 28-8 at 1–2.

Although it is a close question, the Court determines that the "sham affidavit

doctrine"[5] does not operate here to bar or preclude Plaintiff's deposition testimony.

This "head kick" testimony was clear and was not "extracted" by Plaintiff's

lawyer's coaching during her deposition.  The complaint and interrogatory answers

were written by a lawyer, or perhaps drafted by a paralegal.  Plaintiff's first chance

to personally tell her story contains this plain (and otherwise unimpeached beyond

Shue) description of how she was kicked in the head and how the blow only could

have come from Officer Shue.  Plaintiff did not give a deposition and produce full

discovery, only to contradict or "correct" some omitted or impeaching fact at the

---

[5] This doctrine is basically one of judicial estoppel.  It almost always applies when a later
affidavit contradicts or saves, in the affiant's favor, a prior sworn deposition by that affiant.  It is
infrequently applied, and usually is invoked when a lawyer has sought to plug a hole at the end
of the case with an affidavit that contradicts earlier, more reliable testimony.  *See Van T. Junkins
& Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given
clear answers to unambiguous questions which negate the existence of any genuine issue of
material fact, that party cannot thereafter create such an issue with an affidavit that merely
contradicts, without explanation, previously given clear testimony."); *see also Allen v. Bd. of
Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1316–1317 (11th Cir. 2007); *Rolllins v. TechSouth,
Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987).

end through an affidavit piled onto a summary judgment response at the last minute.

Plaintiff notes the Eleventh Circuit "appears to have applied the [sham affidavit] rule only when an affidavit or declaration contradicts sworn deposition testimony."  Doc. 39 at 8 (citing *Baysa v. Gualtieri*, 786 F. App'x 941 (11th Cir. 2019), and *Allen*, 495 F.3d at 1316).  That is not the scenario here.  Plaintiff's deposition testimony expanded her original interrogatories and did not expressly contradict them.  This is more in the nature of trial impeachment rather than disqualifying.

Subject to the "sham affidavit" rule, a "plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature."  *Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019) (citations omitted).  Plaintiff's testimony is not facially incredible and does not fit squarely within the present state of the "sham affidavit" doctrine.

Officer Shue denies kicking a compliant Plaintiff in the head when she was on the ground handcuffed.  And the "bump on the head" noted in Plaintiff's medical clinic report two days later is consistent with her banging her head in a rage while inside the patrol car, something which might well have happened and

18

has some support in the record such as the other officer's testimony and the EMS

run report.  As the Eleventh Circuit has noted, this "presents us with 'a classic

swearing match, which is the stuff of which jury trials are made.'"  *Id.* (quoting

*Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013)).  For the

reasons already articulated, if a jury believes Plaintiff's testimony, she is entitled to

a judgment in her favor on the excessive force claim. Striking a compliant and

handcuffed suspect after all resistance has ceased amounts to a clearly established

constitutional violation.  A jury will determine whether this happened.

As to Count V, common law battery, the Defendant asserts the Florida

statutory immunity discussed above in regard to Count II.  The same analysis

applies.

**The First Amendment Count:**  Plaintiff's Count VII alleges that she

possessed a First Amendment right to film the police, and was doing so in a public

place in a safe and nonthreatening manner.  The Count alleges that Officer Shue

violated Plaintiff's First Amendment rights by forcibly stopping her filming.

The First Amendment of the U.S. Constitution states in its entirety:

> Congress shall make no law respecting an establishment of religion, or
> prohibiting the free exercise thereof; or abridging the freedom of
> speech, or of the press, or the right of the people peaceably to assemble,
> and to petition the Government for a redress of grievances.

It is quite a capacious reading of this language to find Plaintiff had an

affirmative right under this text to peacefully film police action in a public place,

when she was not engaged in protesting, speech, or any expressive conduct. However legal the simple act of filming police in public may be, it does not fit well within the text of this Amendment when divorced from expressive conduct. The Eleventh Circuit has indeed recognized an affirmative First Amendment right to videotape police activity in public, if done in a peaceful and non-obstructive manner. *Smith v. City of Cumming*, 212 F. 3d 1332, 1333 (11th Cir. 2000); *Bowers v. Superintendent Miami S. Beach Police Dep't*, 557 F. App'x 857, 863 (11th Cir. 2014); *Toole v. City of Atlanta*, 798 F. App'x 381, 387 (11th Cir. 2019).[6] In *Smith* the Court, per Judge Barkett, established this substantive right in a ruling unnecessary to the holding, overruling a district judge who had found no such right. *See* 212 F.3d at 1333.

Because this First Amendment right is set forth by the Eleventh Circuit, it is well-established. Indeed, Defendant Shue testified that he became aware Plaintiff was filming and that filming was not by itself an arrestable offense and citizens "absolutely" may film police at a safe distance in a reasonable manner. Doc. 28-2 at 23, 36–37 (Shue: "People can record whatever they want in a public place.").

---

[6] Perhaps a more logical way of addressing this claim would be just to consider it in a false arrest context. Because filming the police in a peaceful, non-obstructive manner is not illegal, the act does not support probable cause to arrest under either Florida common law or the Fourth Amendment.

A Plaintiff who claims a retaliatory arrest for asserting First Amendment rights must plead and establish the lack of probable cause. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019). In the summary judgment context here, Plaintiff must show a contested issue of fact on this point. She has done that.

Whether Officer Shue violated this known right that night at MacDinton's is simply a swearing contest between the only two people who offer evidence on the point. Officer Shue stated he did not. He stated that he told Plaintiff to drop her phone or he would break it as part of arresting her for trespass and obstructing police activity by not backing up. Doc. 28-2 at 26, 57. Plaintiff states entirely the opposite: Shue wanted her to stop filming, became enraged when she said she would not, and accosted her in an arrest takedown and assault as retaliation. *See* Doc. 39 at 10–11 (listing record citations). Plaintiff's friend also testified that one of the officers told Plaintiff to stop filming and knocked the phone out of her hand. Doc. 28-6 at 16.

Based upon the foregoing analysis, this matter is contested factually. Neither the state of the facts nor the qualified immunity doctrine precludes Plaintiff from her day in court on her complaint.

**DONE AND ORDERED** at Tampa, Florida on September 3, 2020.

*|S| William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

21

**<u>COPIES FURNISHED TO:</u>**
Counsel of Record