## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BRENDA BELLAY,

     Plaintiff,

v.

                                    CASE NO. 8:19-cv-206-WFJ-JSS

OFFICER TYLER SHUE, individually,
and THE CITY OF TAMPA,

     Defendants.

_____/

## ORDER DISMISSING CASE

In this case, Plaintiff Brenda Bellay sues the City of Tampa, Florida, and Officer Tyler Shue of the Tampa Police Department for, *inter alia*, false arrest and battery arising out of Plaintiff's arrest at a local bar.  Pending before the Court is the Defendants' Motion to Dismiss and for Sanctions.  Dkt. 93.  Plaintiff filed a response in opposition.  Dkt. 97.  The Court heard from the parties at an evidentiary hearing, Dkt. 109, and permitted the parties to file additional briefs, Dkt. 111 & 112.  Upon careful consideration, the Court grants Defendants' motion and dismisses Plaintiff's case with prejudice as a sanction for spoliation.  The Clerk is directed to issue final judgment for the Defendants and close this file.

## BACKGROUND

Plaintiff is a registered nurse who resides in the Tampa area.  Dkt. 28-5 at 7,

27.  Since 2011, Plaintiff has worked in care manager and compliance nursing positions that require her to use a computer to review electronic medical records. *Id.* at 20−23, 25, 36; Dkt. 113 at 141.  Plaintiff has some experience as a litigant.[1]

On the evening of Saturday, September 13, 2015, Plaintiff and her female friend had dinner and drinks together at a Tampa restaurant on Howard Avenue. Dkt. 28-6 at 7−9.  It was the friend's fiftieth birthday.  *Id.* at 7.  After leaving the restaurant, the pair visited several bars on the same street.  *Id.* at 10−11.  Though Plaintiff states the only alcohol she consumed the entire night was two glasses of wine at dinner, Dkt. 28-5 at 66, her friend states that Plaintiff consumed more alcohol at these other establishments, Dkt. 28-6 at 10−11.  After patronizing about five other bars, Plaintiff and her friend went to MacDinton's Irish Pub.  Dkt. 28-5 at 59−60, 68.  Following an incident with MacDinton's security agents, the women were arrested by Officer Shue and his fellow officer at roughly 1:30 a.m. on Sunday, September 14th.  Dkt. 28-1; Dkt. 28-6 at 12−13.  Plaintiff was charged

---

[1] Beyond her instant arrest in 2015, which resulted in a nolle prosequi dismissal of her charges, *State v. Bellay*, No. 15-CM-14112 (Fla. Hillsborough County Ct. 2015), Plaintiff has been involved in several other cases.  Plaintiff's record includes a 1986 arrest in Indian River, Florida, for driving under the influence ("DUI"), to which Plaintiff pled no contest. Dkt. 28-5 at 50−51. In 2005, Plaintiff was arrested for obstructing or opposing law enforcement, and her case was dismissed by a nolle prosequi. *State v. Bellay*, No. 05-CM-8488 (Fla. 13th Cir. Ct. 2005).  After her 2005 charge was nolle prossed, she successfully sued the City of Tampa for false arrest, prevailing at trial and on appeal to the Second District Court of Appeal. *Bellay v. City of Tampa*, No. 08-CA-2934, 2010 WL 9067343 (Fla. 13th Cir. Ct.), *aff'd by* 52 So. 3d 664 (Fla. 2d DCA 2010) (per curiam).  In 2006, she was arrested for leaving the scene of an accident with property damage.  Dkt. 28-5 at 51.  In 2019, she was summonsed to defend a misdemeanor charge of criminal mischief, for which her present attorneys achieved a nolle prosequi dismissal.  *State v. Bellay*, No. 19-CM-5869 (Fla. Hillsborough County Ct. 2019).

with trespass and resisting an officer without violence. Dkt. 28-1. This arrest gave rise to Plaintiff's present suit.

While the pretrial discovery produced in this case did not paint a complete picture of the details surrounding Plaintiff's arrest, the consensus is that the events at the heart of this lawsuit were set in motion when Plaintiff's friend and MacDinton's security agents became engaged in a heated confrontation. Dkt. 28-5 at 74. According to Plaintiff, Officer Shue and a fellow officer arrived at the scene and asked the friend for some identification. *Id.* at 74−75. The friend refused the officers' request for identification "numerous times." *Id*. at 75. Officer Shue's fellow officer testified that he needed the identification to complete a trespass warning. Dkt. 28-3 at 8. But the friend, who was yelling, refused to produce her identification and struck the fellow officer. *Id*.; Dkt. 28-5 at 61, 75. Plaintiff testified that the same officer also asked Plaintiff for her identification. Dkt. 28-5 at 61, 78–79. Plaintiff flatly denies that she was ever trespass noticed or otherwise instructed to leave the MacDinton's parking lot. *Id.* at 169.

As the officers handcuffed the friend, Plaintiff filmed the incident on her iPhone 5s. *Id.* at 79−81, 144. While filming, Plaintiff says the officers twice told her to back up. *Id.* at 61, 81. She testified that she was five-to-six feet behind Officer Shue at that point. *Id.* at 82. Plaintiff claimed that she took a step back

3

as ordered and announced that she was recording the incident and that doing so was not illegal.  *Id.* at 83.  Plaintiff stated that Officer Shue then accosted her without warning and slammed her into the patrol car, apparently incensed that she refused to stop filming.  *Id.* at 61−62.  Plaintiff testified that Officer Shue directed her to "relax" before saying, "Drop your phone or I'm going to break it."  *Id.* at 83−84.  Officer Shue then purportedly kicked Plaintiff in the back of the head while she was handcuffed, compliant, and lying on the ground.  *Id.* at 113.  Thereafter, Officer Shue allegedly yanked Plaintiff to her feet by her handcuffs, causing additional injury.  *Id.* at 110, 131−32.

In offering a different version of events, Officer Shue denied engaging in any conduct that would have caused injury to Plaintiff.  Dkt. 28-2 at 46−47.  Officer Shue testified that when he arrived at MacDinton's that night, he was told by his fellow officer that Plaintiff and her friend had been asked to leave by MacDinton's staff but were refusing to do so.  *Id.* at 8.  Officer Shue stated that his fellow officer was focused on Plaintiff's friend, who was on the ground for an unknown reason.  *Id.* at 9.  Officer Shue testified that he and his fellow officer helped Plaintiff's friend to her feet and told both women they were being asked to leave.  *Id.* at 9−11.  According to Officer Shue, the women refused to leave, and Plaintiff's friend then struck his fellow officer.  *Id.* at 13.

As the officers were taking the friend into custody for battery, Office Shue

stated that Plaintiff kept crowding him. *Id.* at 15. He claims he had to push her back several times, as she was causing a safety concern and interfering with his investigation. *Id.* at 15, 22. Because Plaintiff refused to cooperate, Officer Shue arrested her. *Id.* at 16. Officer Shue testified that when he was arresting Plaintiff, she repeatedly asked, "Do you know who I am?" Dkt. 28-2 at 17. Concerning this assertion, Plaintiff later testified, "I said [to Officer Shue] my name is Brenda Bellay, please check the Tampa Police record of false arresting me.[2] And he yelled 'I don't care who you are.'" Dkt. 28-5 at 86.

Officer Shue's fellow officer was unable to recall any significant details of Officer Shue's interaction with Plaintiff, as the fellow officer had been occupied with Plaintiff's unruly friend. Dkt. 28-3 at 12−14, 16−19. Nor do relevant details about Plaintiff and Officer Shue's interaction exist in the fellow officer's written report. *Id.* at 14−15.

During pretrial discovery, Plaintiff produced five video clips that she claimed to have filmed on her iPhone 5s during the MacDinton's incident. As produced by Plaintiff, these clips were labeled "untitled (1).MOV," "untitled 2.MOV," "untitled 3.MOV," "untitled 4.MOV," and "untitled 5.MOV." Dkt. 34.

These five video clips are very short and nonconsecutive depictions of the

---

[2] Plaintiff appears to have been referring to her 2005 arrest for obstructing or opposing law enforcement and her related false arrest suit against the City of Tampa.

incident.  *Id.*  Plaintiff's videos show Plaintiff and her friend in MacDinton's

parking lot as loud music plays in the background.  *Id.*  Plaintiff's friend, who

appears intoxicated, wears a green paper wristband indicative of the admission

wristbands patrons receive at bars.  *Id.*  That wristband did not come from

MacDinton's.  Dkt. 28-4 at 36–38.

In one of the videos, Plaintiff's friend is seen striking Officer Shue's

fellow officer on the chest with her open hand while loudly cursing at him.  Dkt.

34 (untitled 4.MOV); Dkt. 28-5 at 61.  The blow Plaintiff's friend made to the

officer was a moderate open-handed strike; this conduct was plainly what one

would call a battery.  Dkt. 34 (untitled 4.MOV); *see also* Dkt. 28-3 at 10.  In

other video clips, the friend is seen on her knees in the parking lot with the same

officer standing nearby.  Dkt. 34 (untitled 1.MOV & untitled 3.MOV).  Another

video depicts the friend's arrest, during which Officer Shue can be heard telling

Plaintiff to "Back up.  Back up."  *Id.* (untitled 5.MOV); Dkt. 28-5 at 61, 129;

Dkt. 113 at 170 (Plaintiff testified, "He was yelling at me, back up, back up.").

In another video, Officer Shue is attempting to handcuff Plaintiff while

sternly saying, "Drop the phone or I'm going to break it."  Dkt. 34 (Untitled

2.MOV); Dkt. 28-2 at 51.  Plaintiff replies, "No, I'm not going to," whereupon

an immediate scuffle ensues.  Dkt. 34 (untitled 2.MOV); Dkt. 28-5 at 62.

During the scuffle, which cannot be clearly seen on the video, Plaintiff drops her

phone, and Officer Shue physically takes Plaintiff to the ground.  Dkt. 28-5 at

62, 118.  At one point in this clip, Plaintiff exclaims, "You must not know."

Dkt. 34 (untitled 2.MOV); Dkt. 28-2 at 51; Dkt. 28-5 at 86.  Plaintiff testified

that this statement was in reference to an unrecorded earlier moment in which

she told Officer Shue it is legal to film law enforcement.  Dkt. 28-5 at 62.

In terms of timing, the deposition testimony of Plaintiff's friend generally

aligns with what was depicted in the five videos.  The friend recalled that things

escalated after she "flat hand pushed" Officer Shue's fellow officer.  Dkt. 28-6 at

16−17.  She testified that at some point the same officer started to "drag" her and

"question" her.  *Id.* at 38.  The friend stated that, at this moment, Plaintiff was

within an arm's reach of the officers and began asking them what was happening.

*Id.* at 38−39.  Plaintiff's friend testified that Officer Shue asked Plaintiff to stop

recording and, when she did not, knocked the phone out of Plaintiff's hand.  *Id.* at

16.  The friend denied being drunk but testified that she had around four drinks that

night.  *Id.* at 34−35, 38.  The friend appears inebriated in the video clips.

After the production of the five videos, Officer Shue moved for summary

judgment, noting that no other competent evidence existed regarding Plaintiff's

physical arrest beyond the parties' opposing narratives.  Dkt. 28.  The Court denied

Officer Shue's motion, pointing to the parties' contradicting versions of events

surrounding Plaintiff's arrest.  Dkt. 54.  The Court noted that the facts outlined

above were "disputed and somewhat murky," emphasizing that "[e]xactly what happened is 'choppy' on this record." *Id.* at 4−5.

In addition to the disputed facts surrounding Plaintiff's actual arrest, the Court explained that "[a]n equally contested set of facts involves the incidents post-arrest." Dkt. 54 at 8. Officer Shue testified that he offered to issue Plaintiff a notice to appear so that she could be released and appear in court later at her own recognizance. Dkt. 28-2 at 55. While Plaintiff's friend agreed to sign a notice to appear, Dkt. 28-6 at 21–22, Officer Shue stated that Plaintiff refused to do the same. Dkt. 28-2 at 55. But according to Plaintiff, Officer Shue told her, "You need to sign this," without actually producing any paperwork to sign. Dkt. 28-5 at 162. Plaintiff contends that Officer Shue never explained that he was asking her to sign a notice to appear. *Id.* at 162−63.

The Court also recognized a number of conflicting facts concerning Plaintiff's injuries and medical treatment at the scene. Dkt. 54 at 8−9. Plaintiff bonded out of jail on Sunday, September 14th—the same day as her arrest—and visited a medical clinic two days later. Dkt. 28-5 at 97, 106−07, 164−65. Plaintiff presented with mild to moderate bruising on her legs and wrists and a palpable bump on her head. *See id.* at 180–86. The medical clinic staff offered Plaintiff pain medication, but she declined. *Id.* at 97.

Concerning Plaintiff's injuries, Officer Shue testified that, after placing

8

Plaintiff in the back of the patrol car, Plaintiff "started acting like she was having a seizure." Dkt. 28-2 at 54. The officers called for emergency medical services ("EMS") to come to the scene and medically assess Plaintiff. *Id.* After Plaintiff was cleared by EMS officers, Officer Shue stated that Plaintiff began slamming her head against the patrol car's center partition and had to be placed in a "total appendage restraint" garment to restrict her movement. *Id.* at 56. Officer Shue's fellow officer agreed with this version of events. Dkt. 28-3 at 13−15, 24. Plaintiff, however, denied any recollection of being assessed by EMS officers or slamming her head into the patrol car's center partition. Dkt. 28-5 at 153–55. Plaintiff claimed that her injuries were the result of Officer Shue attacking her during her arrest. *Id.* at 62, 84−85.

An EMS report shows that an ambulance was called to MacDinton's at the time of Plaintiff's arrest to assess an individual who was "unconscious or fainting." Dkt. 49-1 at 3; Dkt. 49-2 at 3−4. The report identifies this individual as Plaintiff. Dkt. 49-1 at 4; Dkt. 49-2 at 3. In the report, EMS responders described arriving to the scene to find Plaintiff "awake and yelling." Dkt. 49-1 at 3; Dkt. 49-2 at 4. The EMS responders' primary impression of Plaintiff's condition was listed as a "behavioral psychiatric disorder," with a listed condition code of "alcohol intoxication or drug overdose." Dkt. 49-1 at 4−5; Dkt. 49-2 at 5. While the EMS responders testified to this report, they had no independent recollection of the

incident.  Dkt. 49-1 at 3; Dkt. 49-2 at 8.

At the summary judgment hearing, Plaintiff's lawyers suggested that there may have been a mistake in identity, as Plaintiff's friend could have been the individual assessed by the EMS responders.  *See* Dkt. 54 at 9.  Officer Shue's counsel countered that Plaintiff may have been too drunk or upset to remember this interaction.  *Id.*  The Court ultimately found that Plaintiff's injuries were consistent with both sides' version of events.  *Id.*

Concerning the five videos available to the Court at the summary judgment proceeding, the Court ultimately gave Plaintiff the benefit of the doubt as to the honesty and bona fides of these recordings, stating:

> Plaintiff sought to record the incident with her phone but was unsuccessful in completing a full recording; we have only a few fairly incomprehensible snippets . . . [yielding] an incomplete recording of the incident[.]"

*Id.* at 4.  The Court credited Plaintiff's claim that she calmly attempted to film the incident and backed up when instructed.  *Id.* at 12.

However, the Court recognized that the five video tapes contradicted Plaintiff's testimony regarding the timing of when Officer Shue ordered her to drop her phone.  As noted by the Court, one of the videos showed Officer Shue directing Plaintiff to drop her phone before the takedown—not after.  *Id.* at 7.  The Court further noted that the evidence was disputed as to whether Plaintiff was crowding the officers when they were arresting her disputatious friend.  *Id.* at

10

12.  Officer Shue ultimately did not appeal the Court's denial of summary judgment on the issue of qualified immunity, presumably because the Court cited the contradictory nature of the record.

With the Court denying summary judgment, the matter was set for jury trial. Dkt. 68.  A large venire was summonsed due to potential COVID-19 issues.  The parties picked the jury on Friday, July 9, 2021, with the trial set to begin the following Monday.  Dkt. 82.  On Saturday, July 10th, Plaintiff's counsel informed Defendant's attorneys that Plaintiff had produced a new video clip that she claimed to have filmed during the MacDinton's incident.  *See* Dkt. 93-3.  Plaintiff's counsel immediately emailed this new video to the defense attorneys.[3]  *Id.*

This short video file bears the suspicious name of "IMG_1781.TRIM.MOV."  Dkt. 91.  The tape starts out unusually, as it begins with a repeated, frozen frame image of Plaintiff's friend facing the camera.  *Id.* This frozen frame image is depicted for around 25 frames.  *See id.*  The tape then jumps from this still frame image of the friend to video footage of the officers' attempting to handcuff the friend as she vigorously resists.  *Id.*  Given this sixth tape shows the arrest of Plaintiff's drunken, shrieking friend, its footage appears to chronologically follow that of the earlier-produced untitled 4.MOV tape, which

---

[3] Plaintiff's counsel acted ethically throughout this case and is in no way responsible for this unfortunate incident.

shows the friend's battery of the fellow officer.  *Id.*; Dkt. 34 (untitled 4.MOV).

Moreover, the sixth tape reveals that Plaintiff added to the level of disturbance

caused by the friend.  The footage clearly shows that Plaintiff was not backing up

as instructed and was standing much closer—dangerously closer—to Officer

Shue's back and weapons than Plaintiff had represented in pretrial discovery.  Dkt.

91.  The newly produced video clip supported the defense theory of the case.

Most concerning was this tape's naming convention, which was unlike those

of the other five videos produced by Plaintiff in terms of both capitalization and

wording.  *Id.*; Dkt. 34. The wording present in this tape's title—specifically the

term "TRIM"—suggested that the clip had been edited.  Even worse, the clip's

metadata revealed that this clip had been created on October 15, 2015, a month

after the MacDinton's incident.[4]

Because the trial was important to both sides and the result could bear

significantly on Officer Shue's career, the Court granted the defense's motion for

mistrial, discharged the jury, and permitted discovery into the provenance of the

video excerpts—now six in number.  Dkts. 84 & 85.  The defense took advantage

of the additional discovery by taking Plaintiff's deposition on the issue, obtaining

forensic images of her laptop and current, newer iPhone XS, and retaining a digital

---

[4] When one views the "properties" panel of the late-produced video, the video's metadata listed under "Origin" states "media created 10/15/2015 11:52 AM."  Dkt. 91 (video's EXIF data).

forensics expert.

Defendants thereafter filed the present Motion to Dismiss and for Sanctions, Dkt. 93, asserting that Plaintiff gave false testimony, committed spoliation, and engaged in litigation misconduct.

## ANALYSIS

The Court first sets forth its findings of fact before turning to its conclusions of law.

## Findings of Fact

In assessing the present Motion to Dismiss and for Sanctions brought against Plaintiff, the Court carefully considered several pertinent filings submitted by the parties.  Dkts. 97, 111, 112, 115.  The Court also held an evidentiary hearing on the matter.  Dkt. 113.  Both Plaintiff and the defense's digital forensic expert testified at that hearing, with the expert also providing a detailed affidavit with exhibits. Dkt. 93-1 & 113.

The Court ultimately found the defense expert to be qualified and determined that his affidavit and testimony made sense, were internally consistent, and were worthy of full credit.  Although Plaintiff consulted a digital forensic expert prior to the hearing, *see* Dkt. 113 at 162, Plaintiff did not call an expert to testify or provide a rebuttal affidavit.  Throughout the hearing, the defense expert's testimony was contradicted only by Plaintiff's testimony, which did not make

13

sense, was internally inconsistent, and was not worthy of credit.

In his affidavit, the defense expert stated that the five "untitled" videos produced by Plaintiff during pretrial discovery were not original videos.  Dkt. 93-1 at 3.  The expert arrived at this conclusion for two reasons.  First, the expert explained that original Apple media files recorded on an iPhone 5s, like the one Plaintiff used to film the incident, possess titles including the prefix "IMG_."  *Id.* at 22.  Accordingly, when a video is recorded on an iPhone 5s, the resulting video file is automatically labeled "IMG_[number].MOV."  *Id.* at 22−23.  Pursuant to this automatic naming function, the first video a user takes might be labeled "IMG_0001.MOV."  *Id.*  The user's second video would be labeled "IMG_0002.MOV," and so forth.  *Id.*  Original Apple media files would not automatically be named "untitled."  *Id.* at 3.  Second, the five untitled videos' metadata revealed that they were created after Plaintiff's September 2015 arrest. *Id.*

The expert likewise concluded that the late-produced sixth video— IMG_1781.TRIM.MOV—was not an original video.  *Id.* at 3−4.  The expert explained that the term "TRIM" in that video's title was a designation used by video editing programs to label an edited, or "trimmed," video.  *Id.* at 4.  This conclusion is consistent with the Court's extensive research, and Plaintiff did not rebut it through contrary expert evidence or her own testimony, other than to say

14

neither she nor anyone else ever edited the clips. *See, e.g.*, Dkt. 113 at 185.

Plaintiff was asked about the unusual titles of her six videos at her second deposition and the evidentiary hearing. Plaintiff testified that she did not know why five of the videos had the "untitled" nomenclature in their labels. Dkt. 93-2 at 20–21. She stated that she did not change the videos' file names. *Id.* at 21, 22–23; Dkt. 113 at 180–81. As to the sixth video that Plaintiff produced just before trial, Plaintiff could not explain why that video's title included "TRIM" instead of "untitled" like the others. Dkt. 93-2 at 34–35; Dkt. 113 at 180. Plaintiff claimed that her late production of this sixth video was inadvertent and that, in her view, this late-produced video helped her case. Dkt. 113 at 139.

In his affidavit, the defense expert also noted that the late-produced video contained a glitch at the beginning, causing the video to display broken pixels. Dkt. 93-1 at 4–5. He further identified 25.8 frames of frozen video content at the beginning of the video. *Id.* at 6. The expert opined, without contradiction, that glitches and frozen frames are typically indicators of edited footage. *Id.* at 4–6.

Plaintiff repeatedly asserted that she never edited the videos she took on the night in question. Dkt. 93-2 at 30; Dkt. 113 at 185. She testified that she never used any built-in video editing software on her iPhone 5s or current iPhone X, nor did she ever download a third-party editing program. Dkt. 93-2 at 35, 44, 55. Relatedly, at her first deposition, Plaintiff explained that her phone's lack of

15

storage space was the reason she produced several short video clips rather than one continuous video of the MacDinton's incident.  Dkt. 28-5 at 144.  Plaintiff claimed that, while filming the incident, her iPhone 5s would stop recording, and she knew this meant the phone was out of storage.  *Id.*  Plaintiff stated she therefore deleted around four of five apps from her phone to create enough storage space to continue filming.  *Id.* at 80.  Plaintiff later testified that, though she could not recall how many apps she had deleted, it had been less than ten.  Dkt. 93-2 at 33, 38.

When questioned about the present location of her iPhone 5s that she used to film the videos, Plaintiff offered conflicting testimony.  At her deposition following the mistrial, Plaintiff stated that someone stole either her iPhone 5s or her previous iPhone 4.  *Id.* at 8−9.  Plaintiff later told the defense expert that her iPhone 5s had indeed been stolen.  Dkt. 93-1 at 13; Dkt. 113 at 29, 62.  However, at the evidentiary hearing, Plaintiff stated that it was actually her older iPhone 5—not her iPhone 5s—that had been stolen from Plaintiff at a Hooter's restaurant in 2014.  Dkt. 113 at 142.  She testified that she filed a police report for the stolen phone, which she later discovered had been taken to a local AT&T store.  *Id.* at 142−43.

Plaintiff says she then purchased the iPhone 5s that was used to film the MacDinton's incident, but she traded in that phone for an iPhone XS at a local Apple store in 2018.  *Id.* at 143−44.  Plaintiff testified that a technician at that store

had transferred the data from her iPhone 5s to her iPhone XS.  *Id.* at 23.  Plaintiff

says a defect in this iPhone XS prompted her to return that phone and replace it

with a new iPhone XS.  *Id.* at 146.  She stated that she was "pretty sure" she left

her iPhone 5s with the Apple technicians after upgrading to the iPhone XS.  *Id.* at

156–57.  The defense expert's inspection of Plaintiff's iCloud data revealed that

the iPhone 5s had been "repaired" by AppleCare Partners in December 2016, over

a year after the MacDinton's incident.  Dkt. 93-1 at 13.

Unable to forensically examine her iPhone 5s, the defense expert reviewed

Plaintiff's current iPhone XS.  Dkt. 93-1 at 13–14.  The expert explained that the

iPhone XS appeared to have been reset to its factory settings or otherwise wiped of

data in July 2021, the same month the Court ordered an examination of Plaintiff's

devices.  *Id.* at 14; Dkt. 113 at 55, 59, 67, 70.  He found no original, unedited

videos on this phone from the MacDinton's incident.  Dkt. 93-1 at 21.  He did,

however, find ten videos containing footage from that night.  *Id.* at 15.  These ten

videos are all highly questionable.  According to the metadata, nine of these videos

were originally recorded on an iPhone 5s on that night in September 2015. *Id.* at

16–21.  But the metadata further reveals that these nine videos were edited around

a month later on October 11th, 15th, and 18th.  *Id.*  Plaintiff denied the truth of this

metadata at the evidentiary hearing.  *See* Dkt. 113 at 166.

The defense expert also conducted forensic imaging of Plaintiff's laptop

computer, an Apple MacBook.  Dkt. 93-1 at 7.  The expert found that on July 12, 2021, the very day the Court declared a mistrial to permit investigation into spoliation, someone used the Firefox browser on Plaintiff's MacBook to download seven video files with titles containing the TRIM designation.  *Id.*  These seven videos were downloaded from two separate emails delivered to Plaintiff's Yahoo email account, which Plaintiff stated was the only personal email account she used.  *Id.*; Dkt. 93-2 at 47.  The expert could not determine who sent these emails to Plaintiff's Yahoo account, as the emails had already been deleted.  Dkt. 113 at 40.

At her deposition following the mistrial, Plaintiff stated that she did not recall deleting emails from her Yahoo account.  Dkt. 93-2 at 47.  However, she later testified that she deleted emails daily.  Dkt. 113 at 162.  She also stated that at no point did she transfer any videos of the incident to her MacBook or any other computer.  Dkt. 93-2 at 37−38.  Though Plaintiff denied ever saving data on her iPhone 5s or iPhone XS through a "backup" process, *id.* at 9−10, the defense expert found that Plaintiff's MacBook contained various backups of her previous phones—including her iPhone 5s.  Dkt. 93-1 at 26; Dkt. 113 at 61.  Other than on her current iPhone XS, or possibly within the iCloud account that she stated she did not know she possessed, Plaintiff offered no other location where videos from the night in question could be stored.  Dkt. 93-1 at 21−22; Dkt. 113 at 183.  Though she claimed she did not know she had an iCloud account, Plaintiff further

testified that she was the only individual with access to it.  Dkt. 93-2 at 26, 36.

Relatedly, Plaintiff testified that she never sent videos of the MacDinton's incident

to anyone other than to her attorneys on July 6, 2016, and, perhaps, to one other

law firm on a different date.  *Id.* at 15−16, 43.

In inspecting the contents of the MacBook's downloads folder, the defense

expert only located one of the seven aforementioned TRIM videos that had been

downloaded from Plaintiff's Yahoo email account on the day of the mistrial.  Dkt.

93-1 at 8.  The located video was titled "IMG_1781.TRIM (1).MOV," which the

expert recognized was similar in name to the sixth video that Plaintiff produced

immediately before trial.  *Id.* at 9.  However, the metadata of IMG_1781.TRIM

(1).MOV and the late-produced video differed.  *Id.*

The expert determined that the other six TRIM videos downloaded on July

12th were deleted from the MacBook shortly after the Court ordered an

examination of Plaintiff's devices the same day.  *Id.*  Because Plaintiff's MacBook

had a solid-state drive resulting in the permanent loss of deleted files, the expert

could not recover those six deleted videos.  Dkt. 113 at 39−43.  Based on the above

findings, the defense expert ultimately concluded that Plaintiff or her agent

received the seven TRIM videos via email, downloaded the same seven videos to

Plaintiff's MacBook, and subsequently deleted six of those videos from the laptop

on the day of the mistrial or shortly thereafter.  Dkt. 93-1 at 7−10.

The defense expert further identified browser records on Plaintiff's MacBook that revealed someone downloaded three other videos from emails sent to Plaintiff's Yahoo email account on August 14, 2021—two days before Plaintiff was scheduled to produce her devices to the defense expert for examination. *Id.* at 8−9. As with the July 12th emails, the sender of these August 14th emails is unknown because the emails were immediately deleted. *Id.*; Dkt. 113 at 40, 47−48.

The expert determined that one of the videos downloaded from the August 14th emails had been titled "IMG_1793-1.MOV." Dkt. 93-1 at 8−9. Though the expert could not locate that video, he found a zipped file on the MacBook that encompassed videos titled "IMG_1793.MOV" and "IMG_2313.MOV," both of which had been downloaded to the laptop on August 14, 2021. *Id.* The expert noted that neither of these two videos were original videos, as both were created one month after the MacDinton's incident. *Id.* at 9. Moreover, the footage depicted in these two videos was identical to the footage seen in the videos produced by Plaintiff during pretrial discovery. *Id.* IMG_1793.MOV was found to be a duplicative version of untitled 2.MOV, while IMG_2313.MOV was discovered to be a duplicative version of untitled (1).MOV. *Id.*; Dkt. 113 at 29, 62. How these two duplicate videos received their high numeral titles of "1793" and "2313" is unknown.

20

At the evidentiary hearing, Plaintiff objected to the expert's assertions that she had downloaded videos of the incident to her MacBook from her Yahoo email on July 12, 2021, and August 14, 2021. Dkt. 113 at 146−47. When pressed, she explained that she simply did not know whether this expert testimony was accurate. *Id.* at 147−48, 162. Although Plaintiff works with electronic files daily at her job as a records reviewing nurse, she feigned ignorance of basic computer literacy at the evidentiary hearing. Plaintiff stated, "I'm not even sure how to upload or download. If it says I did it, I did it. I'm not sure what goes into the process of uploading or downloading." *Id.* at 162. Her attorney attempted to rehabilitate her by suggesting that the July 12th emails could have been emails Plaintiff sent to a digital forensics expert whom she consulted after this Court declared a mistrial. *Id.* at 154−55. This was not established. *Id.*

As part of his examination, the defense expert also obtained access to Plaintiff's Apple iCloud account. Dkt. 93-1 at 13. Of 425 videos stored in Plaintiff's iCloud account, four of them possessed titles including the TRIM term: IMG_1542.TRIM.MOV, IMG_1781.TRIM.MOV, IMG_1782.TRIM.MOV, and IMG_3767.TRIM.MOV. *Id.* Three of these four videos depict the MacDinton's incident. *Id.* at 21. The expert noted that IMG_1781.TRIM.MOV, which was the late-produced video that spurred the mistrial, had been uploaded to Plaintiff's iCloud account one month after Plaintiff's arrest. *Id.* at 21, 24. The other two

21

relevant TRIM videos were copies of two of the untitled videos produced in pretrial discovery.  *Id.* at 22.

According to the expert, the fact that the four discovered TRIM videos possess titles with numbers very distant from one another indicates that these videos were not created sequentially or near in time.  *Id.* at 22−23.  The expert noted, though, that two of the three relevant TRIM videos possess titles with consecutive numbers: IMG_1781.TRIM.MOV and IMG_1782.TRIM.MOV.  *Id.* at 21−22.  Had these two videos been created at MacDinton's on the night in question, the video titled IMG_1782.TRIM.MOV should theoretically contain video footage that sequentially follows the footage seen in IMG_1781.TRIM.MOV based on the videos' numeric titles (absent the TRIM designation).  *See id.*  But the footage seen in the former does not follow the footage seen in the latter.  Both files contain the same footage.  *Id.*  The expert therefore concluded that someone created various versions of the same clip after the MacDinton's incident, resulting in duplicative files with different names.  *Id.* at 22.  How these two videos came to be labeled with the TRIM designation and diverging numeric labels was a mystery that Plaintiff could not explain at the evidentiary hearing.

As to the third relevant TRIM video found in Plaintiff's iCloud, which was IMG_1542.TRIM.MOV, Plaintiff's Apple data log shows that this video and an unlocated, duplicative version titled "IMG_1542.TRIM1.MOV" were added to

Plaintiff's iCloud library on October 12, 2015. *Id.* The expert noticed that "IMG_1542.TRIM1.MOV" was immediately preceded by a video titled "IMG_1537.MOV," with the expert emphasizing the five-digit gap in the titles' numerals. *Id.* at 23−24. Likewise, a six-digit gap in numerals was observed between IMG_1542.TRIM1.MOV and the title of the video that followed. *Id.* None of the videos surrounding IMG_1542.TRIM1.MOV possessed TRIM titles. *Id.* at 24. The expert plausibly inferred that the numeric gaps between these videos suggests that videos with titles containing those missing numerals had been deleted. *Id.* at 23. Given that the number 1542 was the lowest numeral found on any relevant video, those missing video files—especially those preceding the number 1542—were likely original videos from the night in question. *Id.*; Dkt. 113 at 66−67.

When asked at the evidentiary hearing whether she ever deleted original videos from the night in question, Plaintiff departed from the earlier denial she made at her second deposition. She answered, "I'm not sure. I made several copies, and for storage I would delete an app and come back and delete a copy. I don't know if they were the originals or not, to be honest with you. They were all the same." Dkt. 113 at 176. She then stated, "I have deleted duplicates, but I didn't look at the title." *Id.* at 177−78. When asked if she could have deleted the original videos since she supposedly did not look at titles of videos while deleting

them, Plaintiff stated, "I'm not sure.  I cannot concede that.  And that was to free up more storage."  *Id.* at 178.

The expert's examination of Plaintiff's Apple data also revealed that Plaintiff contacted Apple's technical support team by phone three times on July 12, 2021, after the Court granted the defense leave to examine Plaintiff's electronic devices.  Dkt. 93-1 at 24.  That same day, Plaintiff also visited an Apple store in Tampa to speak with Apple technicians.  *Id.* at 25.  The Court and Defendants were unaware of this visit until the defense expert discovered it in Plaintiff's Apple records.  When asked at the evidentiary hearing why she contacted Apple on the day of the mistrial, Plaintiff testified that she had wanted to find out what the "TRIM" designation in her sixth video's title meant.  Dkt. 113 at 136.  Plaintiff's counsel made the Apple technicians' notes from Plaintiff's queries into an exhibit that was admitted at the evidentiary hearing.  Dkt. 115-1; Dkt. 115-2.

The Apple technician's notes show that Plaintiff asked if a video bearing the title "trim.mov" had been edited.  Dkt. 115-2  at 11.  The technician verified with Plaintiff that the "trim.mov" file that Plaintiff referenced was "a copy of the original [sic] file and not the original [sic]."  *Id.* at 9.  At one point, Plaintiff's question was referred to a Tier 2 Technical Support advisor, who commented that this "trim.mov" title was "possible with [a] 3rd party or something customer did[.]"  *Id.* at 12.  The advisor explained that Plaintiff "may have changed the name

or used a 3rd party editing app and the app changed the name." *Id.* at 14.  The

advisor noted that Apple's "[s]oftware didn't have the ability to edit the video back

then[.]" *Id.* at 13.  According to the advisor, even if the file had been edited,

Apple's software would not rename the file to include the term "trim." *Id.*  The

advisor concluded that Apple technicians "don't have a way to tell why the name

was changed since it wasn't done by [Apple] software." *Id.* at 14.

Plaintiff's interactions with these Apple technicians essentially created

another expert for the defense.  First, the Apple technicians' notes confirmed that

Plaintiff's late-produced video was not an original video of the MacDinton's

incident.  Second, the same notes indicated that Apple software did not

automatically create the TRIM titles seen on the late-produced video and other

videos discovered on Plaintiff's devices; only Plaintiff or her agent could have

created those titles.

At the evidentiary hearing, Plaintiff falsely testified about her conversations

with Apple technicians.  Plaintiff testified that Apple "thought maybe I did it, but I

didn't do it.  I thought the phone did it.  I am not sure." Dkt. 113 at 181.  She

stated that Apple "said it either came from a third party or I changed it[.]" *Id.*

Moments later, Plaintiff then claimed, "I have asked Apple employees.  And they

said that the videos were not edited, that the title changed. And the word 'trim' can

come up there however it does because of storage." *Id.* at 185.

25

Shortly thereafter, the following exchange took place:

THE COURT: You just told me about three minutes ago that Apple
told you the videos weren't edited.
THE WITNESS [Plaintiff]:  Correct. Yes, sir.
THE COURT: They said they weren't edited?
THE WITNESS:  The title changed, but the video itself had not
been edited.
THE COURT: That's not what [defense counsel] read.  How would Apple
know that?
THE WITNESS:  I'm not sure what she's reading, but I have
the document that says the videos were not edited.
THE COURT:  Apple said these videos were not edited?
THE WITNESS:  Yes, Your Honor.
THE COURT:  I'd love to see that.
THE WITNESS:  My phone is in a locker downstairs.
. . .
THE COURT:  It is your testimony here today that Apple told
you these videos were not edited?
THE WITNESS:  Yes, Your Honor.
. . .
THE COURT:  So you're saying Apple said the videos were not
edited?
THE WITNESS:  Yes, Your Honor.
THE COURT:  Period.
THE WITNESS:  Correct.
THE COURT:  And that's in your phone.
THE WITNESS:  Correct.
THE COURT:  All right.  We're going to take a ten-minute break.  Go get
your phone.  We want to see that.

*Id.* at 187−89.

Following this exchange, the Court recessed and instructed Plaintiff to

retrieve her phone.  When testimony resumed, it was clear that Plaintiff had no

such evidence whatsoever in her phone or elsewhere.  From her phone Plaintiff

simply read aloud the comments of Apple technicians that were discussed in detail

26

above.  *Id.* at 190–91; *see also* Dkt. 115-2.  Contrary to her assertion to this Court, there is no proof that anyone at Apple told Plaintiff that the subject videos were not edited or that "trim can come up there however it does because of storage."  Her testimony is fatuous.  On redirect examination, Plaintiff's attorney gamely attempted to rehabilitate her by suggesting this was simply her misunderstanding of the Apple technicians' words.  Dkt. 113 at 197–99.  Her answers there were equally disingenuous.  *Id.*

As noted above, the Apple technicians said that Apple software did not give Plaintiff's videos those titles, which must have come from Plaintiff or a third party. These comments are entirely consistent with the conclusions of the defense expert. The iPhone 5s does not automatically label any video with the "untitled" designation seen in the titles of the five videos Plaintiff produced during pretrial discovery.  Nor does the iPhone 5s title any video with the ".TRIM" term seen in Plaintiff's sixth video produced after jury selection.  The subject titles had to have been generated by a person or some third-party program.  This is not just the credible explanation of this issue—it is the <u>only</u> explanation present in this record. Given Plaintiff's experience with litigation and her clear understanding of how important her late-produced video would be to her case, her claimed absence of knowledge on this issue is not credible.

Equally concerning is the fact that Plaintiff could not explain at the

evidentiary hearing what happened to the original videos filmed at MacDinton's. Perhaps, she suggested, she inadvertently deleted them. *See id.* at 176−78.  What is clear is that no original videos are available to the Court.  As previously mentioned, the videos found in Plaintiff's iCloud account and on her devices possess titles bearing differing numbers that are distant in sequence.  Not only are the sequential numbers widely off, but the terms seen in the videos' titles differ. Some of the videos discovered in these locations bear the ".TRIM" designation, while some do not.  Only the five videos produced by Plaintiff during pretrial discovery bear the "untitled" label.

Moreover, the Court agrees with the expert's conclusion that the six videos produced by Plaintiff during litigation were created well after her arrest in the early morning hours of September 14, 2015.  The following list shows when those six videos were created, according to their metadata:

> untitled (1).MOV was created on 10/11/2015 at 8:07 p.m.
> untitled 2.MOV was created on 10/15/2015 at 12:29 p.m.
> untitled 3.MOV was created on 10/11/2015 at 10:11 a.m.
> untitled 4.MOV was created on 10/18/2015 at  10:11 a.m.
> untitled 5.MOV was created on 10/18/2015 at 11:19 a.m.
> IMG_1781.trim.MOV was created on 10/15/2015 at 11:52 a.m.

Dkt. 34 (videos' EXIF data); Dkt. 91 (video's EXIF data).

Notably, each of these videos was created within the same seven-day period in mid-October 2015.  Prior to her subject arrest, Plaintiff was planning to take a case manager certification exam for a nurse manager position she hoped to obtain.

28

Dkt. 28-5 at 45−47, 57−58; Dkt. 113 at 193.  On October 13, 2015, Plaintiff was informed that she was ineligible to sit for the exam due to the pending criminal charges against her.  Dkt. 28-5 at 46; Dkt. 113 at 165−66.  At the evidentiary hearing, Plaintiff stated that she asked her criminal lawyer to address the pending charges so that Plaintiff could take the exam, but the lawyer told Plaintiff there was nothing she could do.  Dkt. 113 at 166−67.

This period in October 2015 was significant to Plaintiff for another reason. On October 13, 2015, the same date that Plaintiff learned she could not sit for the certification exam, the State of Florida produced its discovery in its criminal case against her.  *Id.* at 192−93.  That criminal discovery showed that there was no surveillance video or law enforcement body camera footage of the MacDinton's incident.  *Id.* at 192–94.  Plaintiff presumably possessed the only footage of the incident.  And while Plaintiff produced five videos during pretrial discovery, she failed to produce her sixth video until after a jury was selected.  Perhaps this was because the sixth video favors the defense.  The six video clearly shows Plaintiff was positioned much closer to the officers than the five-to-six-foot distance to which she testified at her pretrial deposition. Dkt. 91.  Plaintiff was in an unsafe (i.e., very near) position to the officers and was in easy grabbing distance of the officers' weapons as they struggled to arrest her resisting friend.  *Id.*

## Conclusions of Law

The elements of a spoliation claim are: "(1) the existence of a potential civil action; (2) a legal or contractual duty to preserve evidence which is relevant to the potential civil action; (3) destruction of that evidence; (4) significant impairment in the ability to prove the lawsuit; (5) a causal relationship between the evidence destruction and the inability to prove the lawsuit; and (6) damages." *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2005) (citations omitted). Based on these elements and the foregoing findings of fact, the Court concludes that Defendants have stated a claim for spoliation.

Plaintiff brought this suit against Defendants yet failed to preserve original, unedited videos of the night in question. The duty to preserve relevant e-discovery is clear and well-established. *See* Stephen M. Cohen, *Electronic Data and Discovery: Nightmare or Opportunity?*, 76-FEB FLA. B.J. 30 (2002). This duty was made more express in the amendments to the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 37(e) advisory committee's notes (2015 amendment). Despite Plaintiff's experience in litigation, she ignored this duty. No original videos of the MacDinton's incident exist, and the videos that remain have been tampered with and post-date the night in question by roughly one month. Contrary to Plaintiff's false testimony at the evidentiary hearing, the videos' titles were not the product of Apple software. No other explanation exists for the

videos' titles and late creation dates other than the hand of Plaintiff or her agent.

Plaintiff's late production of the sixth video hindered the fair processing of this case. It also caused a large COVID-wary venire to be summoned, and a jury to be selected for naught, with the considerable expenditure of public funds, the parties, and the jurors themselves. Moreover, Plaintiff's spoliation acutely impaired the Court's earlier consideration of Officer Shue's summary judgment motion. The spotty record cited by the Court likely dissuaded Officer Shue from seeking interlocutory appeal based on qualified immunity. Now, years later, if the Court were to deny Defendants' present Motion to Dismiss, Defendants should in all fairness be afforded a chance to reassert their summary judgment motions due to Plaintiffs' withheld evidence and, if still unsuccessful, reassess their interlocutory rights to appeal on qualified immunity. Yet Plaintiff's spoliation was greatly exacerbated by the disingenuous testimony she offered at her subsequent deposition and the evidentiary hearing. Plaintiff has ultimately injured the Court, the defense, and the public through her spoliation.

This Court may sanction litigants for abusive practices. *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545 (11th Cir.), *cert. denied*, 510 U.S. 863 (1993); *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 126 (S.D. Fla. 1987). Spoliation, or the "intentional destruction, mutilation, alteration, or concealment of evidence," is one such abusive practice. *See Optowave Co. v. Nikitin*, No. 6:05-cv-

31

1083-Orl-22DAB, 2006 WL 3231422, at *7 (M.D. Fla. Nov. 7, 2006) (quoting BLACK'S LAW DICTIONARY 1437 (8th ed. 2004)); *see also West v Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

In the context of spoliation, "[s]anctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, . . . and destroys such documents and information." *Optowave*, 2006 WL 3231422, at *7 (citations omitted). In the Eleventh Circuit, sanctions for spoliation of evidence are appropriate "only when the absence of that evidence is predicated on bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (quotation omitted). Moreover, sanctions for spoliation are "intended to prevent unfair prejudice to litigants and to insure the integrity of the discovery process." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005), *cert. denied*, 548 U.S. 903 (2006).

A court has broad discretion in fashioning a remedy for spoliation. *See Optowave*, 2006 WL 3231422, at *1 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)). When determining the seriousness of the sanctions to impose for spoliation of critical evidence, factors "vary according to (1) the willfulness or bad faith of the party responsible for the loss or destruction of the evidence; (2) the degree of prejudice sustained by the opposing party; and (3) what is required to cure the prejudice." *St. Cyr v. Flying J Inc.*, No. 3:06-cv-13-33TEM, 2007 WL

1716365, at *4 (M.D. Fla. June 12, 2007) (citations omitted).

The "extreme sanction" of dismissal with prejudice may be imposed "only when: (1) a party engages in a clear pattern of delay or willful contempt (contumacious conduct); and (2) the district court specifically finds that lesser sanctions would not suffice." *Oniha v. Delta Air Lines, Inc.*, No. 21-13532, 2022 WL 580933, at *2 (11th Cir. Feb. 25, 2022) (citation omitted).  Dismissal with prejudice is "more appropriate in a case where a party, as distinct from counsel, is culpable." *Id.* (citation omitted).

The standard for the sanction of dismissal with prejudice has been met by clear and convincing evidence in this case.  As set forth above, Plaintiff engaged in a clear pattern of willful contempt by tampering with critical evidence, thereby impairing the Court's prior summary judgment ruling and prejudicing the defense. With Plaintiff's spoliation and false testimony leaving this Court without any original, unedited videos from the night in question and causing injury to this Court, the defense, and the public, dismissal with prejudice is ultimately warranted, as no lesser sanction will suffice.

## CONCLUSION

Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss and for Sanction, Dkt. 93.  As a sanction, the Court dismisses this case with prejudice and, per Federal Rule of Civil Procedure 54, awards Defendants prevailing party costs,

to include as a sanction the $6,000 cost of the defense expert, *see* Dkt. 93-4.

   **DONE AND ORDERED** at Tampa, Florida, on August 5, 2022.

_____

**WILLIAM F. JUNG**

**UNITED STATES DISTRICT JUDGE**

**Copies furnished to:**
Counsel of record